COOS–CURRY ELECTRIC COOPERATIVE, INC.,
Petitioner,

v.

James J. JURA, Administrator of the Bonneville Power Administration,* John Herrington, Secretary of Energy, and the United States of America, Respondents.

Nos. 85–7339, 86–7340.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 4, 1987.

Decided June 26, 1987.

* James J. Jura, the current Administrator of the Bonneville Power Administration, is substituted for his predecessor in office pursuant to Fed.R. App.P. 43(c)(1).

Robert Greening, Portland, Or., for petitioner.

John A. Cameron, Jr., Marybeth Van Buren, Portland, Or., for respondents.

Before SNEED and HALL, Circuit Judges, and STEPHENS,** District Judge.

STEPHENS, District Judge:

**Facts**

The Bonneville Power Administration ("BPA") is a power marketing agency within the United States Department of Energy. The BPA markets electric power obtained primarily from hydroelectric generators at the sites of federal dams and delivers the power to its customers through its system of transmission lines. The BPA sells wholesale electric power to utilities, direct service industries, and government customers. Coos-Curry Electric Cooperative, Inc. ("CCEC") is a cooperatively owned utility that buys most of its power from the BPA and resells that power to its members.

The BPA transmits power to utility customers at voltage levels ranging from 230 kV to 115 kV. The utilities distribute the power at 115 kV or lower. When there is a difference in voltage between the BPA's transmission and a utility's transmission, the power transmitted by the BPA must be transformed or "stepped" down to coincide with the utility's lower voltage at the point of wholesale power delivery to the utility.

The transformer required to lower the voltage can be owned and maintained by either the BPA or the utility.

In 1974, the BPA instituted and imposed a "transformation charge" on those utilities that used the BPA's transformers to step down the BPA's transmission voltage to accomodate the utilities' voltage requirements. This charge was designed to recoup the BPA's cost of transforming the power. Utilities that used their own transformers to step down the power were not charged. In 1979, the BPA decided to drop the transformation charge. The BPA learned that the cost to it of stepping down its transmission to the utilities' distribution voltage was, in some instances, negligible. This fact led the BPA to conclude that the continued imposition of the transformation charge was not justified.

However, some utilities had purchased or built transformers in order to avoid the transformation charge. These utilities had incurred the cost of a transformer on the assumption that the charge would continue indefinitely. In response to this situation, the BPA created a program to provide mitigation relief to those utilities that had been financially harmed by their reliance on the assumed continuance of the transformation charge. Fourteen instances of possible reliance were identified. CCEC was identified as one of the utilities possibly eligible for mitigation relief.

Petitioner, CCEC, claims that it is entitled to monetary relief under the BPA's program. The BPA determined that CCEC did not qualify for relief because of its failure to show reliance. CCEC is seeking to overturn the denial of relief in this court.

Before 1979, CCEC maintained a 69 kV transmission line between a BPA transformer substation at Gold Beach, Oregon and Brookings, Oregon. The BPA substation at Gold Beach stepped down the BPA's 115 kV transmission to CCEC's 69 kV line. In 1979, CCEC completed an upgrading of its system that included the conversion of the 69 kV line into a 115 kV line. The

** The Honorable Albert Lee Stephens, Jr., Chief Judge Emeritus, Central District of California, sitting by designation.

upgrading also included a rebuilding of CCEC's substations at Gold Beach, Pistol River, and North Brookings to handle 115 kV. These improvements led to an avoidance of the transformation charge.

In 1982, CCEC made its first request for mitigation relief. In this request CCEC claimed that one of the reasons for upgrading its system was the desire to avoid the transformation charge and that it was therefore entitled to mitigation relief.

However, CCEC conceded in oral argument and the record shows that the overriding reason for upgrading the Gold Beach substation and making other improvements was to improve the condition of CCEC's deteriorated transmission system along its 69 kV line. A report prepared in 1976 at CCEC's request by an engineering consulting firm called attention to the need for major repairs along CCEC's 69 kV line and urged improvement. The report made clear that improvements were necessary. It stated:

> The existing 69 kV line between Gold Beach and Brookings needs extensive repairs and maintenance. The preliminary inspection of the 69 kV line made in June 1976 revealed that up to about 50 percent of the poles are in a state of decay and need to be replaced. Many of the crossarms need reinforcing or replacing, and the conductor at many locations needs to be resagged and reclipped to the insulators.

The report recommended a conversion of the 69 kV line into a 115 kV line in order to accomplish the necessary repairs and meet long-term system demands. The financial benefit resulting from an avoidance of the transformation charge was cited as an additional incentive for the improvements. However, it is fair to conclude from this report that the system would have been upgraded regardless of the existence of the transformation charge.

The BPA denied the initial request for relief, and during the following years CCEC maintained correspondence with the BPA in a continuing attempt to obtain financial relief. There were no formal, "trial-type" hearings conducted by the BPA. The parties attempted to resolve the claim through an exchange of correspondence and submission of documents.

On March 22, 1985, the BPA issued another denial of CCEC's claim for the following reasons: (i) the lack of evidence that avoidance of the transformation charge was the primary reason for upgrading the system; (ii) the existence of evidence that the improvements were made for other reasons; (iii) the fact that the existing facilities would not comply with the BPA's customer service policy. CCEC alleges and the BPA does not deny that these criteria were based on guidelines formulated in the process of deciding an earlier claim for mitigation relief by another utility. On December 31, 1981, the BPA Chief of the Contract Management Branch had written an internal memorandum recommending that relief be granted to a utility with a transformer substation located at West Burley, Idaho. The memorandum proposed several factors to apply to the West Burley case and to use "as guidelines for evaluation of any future" claims for mitigation relief.[1] Among these factors was the re-

---

1. These guidelines were listed as follows:
"1. The customer substation, had it been proposed as a BPA budget item, would have satisfied all of BPA's Customer Service Policy criteria including unwritten current policy interpretation. Some of these criteria are:
   a. the best engineering plan-of-service from a one utility standpoint;
   b. meets feasibility test;
   c. 115 kV or higher construction;
   d. 12.5 kV or higher low voltage delivery;
   e. not constructed inside existing city limits or developing suburban areas, etc.;
   f. substations required primarily for service to a single consumer will be supplied by the customer;

   g. BPA will not construct facilities which assume the customer's distribution responsibility, etc.
2. Substation constructed to acceptable BPA standards.
3. The transformation charge was a primary consideration in the customer's decision to construct the station, as opposed to other factors such as pride of ownership, operational flexibility, reliability, etc.
4. The customer's ownership in absence of the transformation charge creates a financial hardship on the customer.

quirement that avoidance of the transformation charge be a primary reason for upgrading the utility's system.

CCEC filed a petition for review in this court from the March 22 decision and requested reconsideration from the BPA. The request for reconsideration was denied on March 28, 1986, and the BPA issued its Administrator's Record Of Decision On Reconsideration Of The Coos-Curry Electric Cooperative, Inc., Request For Reimbursement. In the Record Of Decision, the BPA made clear that CCEC's claim was denied because avoidance of the transformation charge was not the primary reason for CCEC's upgrade. The BPA also cited other reasons for the denial of relief. CCEC filed a petition for review from this decision, and the two petitions have been consolidated in this review.

■ CCEC is seeking an order from this court directing the BPA to pay CCEC $742,122.00, the amount claimed as mitigation relief. CCEC challenges the BPA's denial of relief on two grounds. First, it alleges that the guidelines are invalid because the BPA violated the rulemaking procedures set forth in the Administrative Procedure Act ("APA"). CCEC claims that the BPA's guidelines for mitigation relief are rules, as defined by the APA, and that the BPA's failure to comply with the notice

and comment and publication procedures renders them invalid.[2] Second, CCEC alleges that the BPA's denial of relief was arbitrary, capricious, or an abuse of discretion. It argues that the BPA's insistence that the transformation charge be the "primary reason" for an upgrade is arbitrary and irrational and that the BPA's prior decisions on requests for mitigation relief are inconsistent. CCEC does not argue that it was denied an opportunity to be heard or that the BPA procedure for deciding the claim denied it due process.

16 U.S.C. sec. 839f(e)(5) grants this court original jurisdiction over petitions for review of final actions by the BPA.[3]

**Jurisdictional Issue**

Before proceeding to the merits, a challenge to this court's jurisdiction must be addressed. The parties agree that the BPA's authority to grant mitigation relief stems from 16 U.S.C. sec. 839f(a).[4] The BPA reads the statutory language as a broad grant of discretion to the Administrator to carry out the permitted actions. From this reading, the BPA concludes that 5 U.S.C. sec. 701(a)(2) of the APA precludes judicial review of the agency action at issue because this action has been "committed to agency discretion by law."

5. Was timing of energization a factor? If so, did any of BPA's construction procedures contribute to the timing problem?
6. Is the substation a Customer Service or Area Service facility?
7. If BPA decides to purchase the facility, the price should be based on the customer's original cost (but no more than BPA estimated cost) depreciated."

It is unclear whether these guidelines were formally adopted by the BPA as the official guidelines, but for purposes of our review it will be assumed that they were.

2. CCEC apparently assumes that if the guidelines are declared invalid, it will be entitled to an order from this court granting the requested monetary relief. This assumption is incorrect. The appropriate relief in this case would be a remand to the BPA for further proceedings.

3. This grant of original jurisdiction to this court "raises procedural problems that will have to be resolved on a case-by-case basis." *California Energy Resources Conservation and Develop-*

*ment Commission v. Johnson,* 807 F.2d 1456, 1465 n. 7 (9th Cir.1986). In some cases, this court may be required to supervise factfinding. Such an effort is not necessary in this case. CCEC's arguments are directed at the formulation of the BPA's guidelines and the application of those guidelines to a set of facts. The material facts necessary for this court's decision are undisputed.

4. 16 U.S.C. sec. 839f(a) states in pertinent part: "Subject to the provisions of this chapter, the Administrator is authorized to contract in accordance with section 2(f) of the Bonneville Project Act of 1937 (16 U.S.C. 832a(f))."

16 U.S.C. sec. 832a(f) states: "Subject only to the provisions of this chapter, the Administrator is authorized to enter into such contracts, agreements, and arrangements, including the amendment, modification, adjustment, or cancellation thereof and the compromise or final settlement of any claim arising thereunder, and to make such expenditures, upon such terms and conditions and in such manner as he may deem necessary."

This narrow exception to judicial review is available "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971) (citation omitted). If no law limits the exercise of administrative discretion, the courts have no standard to guide judicial review. *City of Santa Clara v. Andrus,* 572 F.2d 660, 666 (9th Cir.), *cert. denied,* 439 U.S. 859, 99 S.Ct. 176, 58 L.Ed.2d 167 (1978). In such instances, the courts lack jurisdiction to review the contested agency action. *Id.; e.g., Johnson Oyster Co., Inc. v. Baldridge,* 704 F.2d 1060 (9th Cir.1983).

▆ The flaw in the BPA's argument is that this court is presented with more than 16 U.S.C. sec. 839f(a) and 16 U.S.C. sec. 832a(f) to guide its review. The parties agree that the BPA applied certain guidelines to determine CCEC's eligibility for mitigation relief. This court has jurisdiction, pursuant to 16 U.S.C. sec. 839f(e)(5), to decide whether the proper procedures were used to establish those guidelines, *Santa Clara,* 572 F.2d at 672–73, and whether the BPA acted arbitrarily or abused its discretion in applying those guidelines to CCEC's request for mitigation relief, 5 U.S.C. sec. 706(2)(A).

**APA Issues**

CCEC's first line of attack on the validity of the guidelines alleges that they are invalid because they were not established in accordance with the notice and comment procedures set forth in 5 U.S.C. sec. 553. In other words, CCEC argues that the BPA should have engaged in formal rulemaking procedures to establish the guidelines and that it was improper for the BPA to rely on guidelines established in the course of a prior decision on a claimant's request for mitigation relief.

▆ However, the BPA possessed the discretionary authority to formulate the guidelines governing decisions on mitigation relief through a case-by-case process, rather than through formal rulemaking. *See SEC v. Chenery Corp.,* 332 U.S. 194, 202, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947).

> [An] agency may not have had sufficient experience with a particular problem to warrant rigidifying its tentative judgment into a hard and fast rule ... In those situations, the agency must retain power to deal with the problems on a case-by-case basis if the administrative process is to be effective. There is thus a very definite place for the case-by-case evolution of statutory standards. And the choice made between proceeding by general rule or by individual, *ad hoc* litigation is one that lies primarily in the informed discretion of the administrative agency.

*Id.* at 202–03, 67 S.Ct. at 1580. This language makes clear that the BPA was not precluded from establishing new principles in deciding the West Burley claim for relief. *See NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 294, 94 S.Ct. 1757, 1771, 40 L.Ed.2d 134 (1974); *NLRB v. St. Francis Hospital of Lynwood,* 601 F.2d 404, 414 (9th Cir.1979).[5]

The BPA's freedom to establish guidelines through a case-by-case process is limited by two exceptions. "First, agencies may not impose undue hardship by suddenly changing direction, to the detriment of those who have relied on past policy." *Cities of Anaheim, Riverside, Banning, Colton and Azusa, California v. FERC,* 723 F.2d 656, 659 (9th Cir.1984). Second, agencies may not use this process to circumvent formal rulemaking procedures. *Id.*

▆ Neither of the exceptions applies. The first one is inapplicable because CCEC did not take "any particular action in re-

---

**5.** The rulings in *Chenery Corp., Bell Aerospace,* and *St. Francis Hospital* arose out of cases involving "trial-type" adjudicatory proceedings. As mentioned before, the BPA did not conduct such proceedings in deciding claims for mitigation relief. Nonetheless, the guidelines resulted from an "adjudication" as that term is defined by 5 U.S.C. sec. 551(7) and *Willapoint Oysters, Inc. v. Ewing,* 174 F.2d 676, 693 (9th Cir.), *cert. denied,* 338 U.S. 860, 70 S.Ct. 101, 94 L.Ed. 527 (1949).

liance" on the BPA's pre-guideline policy. *See id.* The only actions taken by CCEC that could arguably be relevant to this exception took place before 1979, before the existence of any policy regarding mitigation relief. The second exception is inapplicable because the BPA did not use the guidelines "to amend a recently adopted rule ... or to supplant a pending rule-making proceeding...." *See id.*

■ CCEC's second line of attack on the guidelines' validity alleges that the guidelines are invalid because they were never published in accordance with the procedures set forth in 5 U.S.C. sec. 552. Even if it is assumed that the guidelines were subject to publication procedures, the BPA's use of them to decide CCEC's claim would still be valid because CCEC has failed to show that it was adversely affected by a lack of publication. *See Zaharakis v. Heckler,* 744 F.2d 711, 714 (9th Cir.1984) (plaintiff argued that agency reliance on rule was invalid because of failure to publish rule pursuant to 5 U.S.C. sec. 552). " '[T]he requirement for publication attaches only to matters which if not published would adversely affect a member of the public.' ... The [petitioner] does not allege that [it] was adversely affected by a lack of publication or that [it] would have been able to pursue an alternative course of conduct" if the guidelines had been published. *See id.* (citation omitted). There is no indication that CCEC has been prejudiced by lack of publication; CCEC has not claimed that it was denied an opportunity to present all relevant information to the BPA.

**Application of the Guidelines to CCEC**

We now consider CCEC's argument that the BPA's denial must be overturned because it applied an irrational factor to the claim for relief and because the BPA's evaluation of relief claims is inconsistent.

■ CCEC asserts that the BPA's "primary reason" test requires a utility to show that avoidance of the transformation charge was the exclusive reason for an upgrade. CCEC reasons that no utility would upgrade a transmission facility sole-ly to avoid the charge and concludes that the BPA's insistence on this showing is arbitrary and irrational. It would seem unreasonable to require a utility to show that avoidance of the transformation charge was the exclusive reason for an upgrade, because many other factors such as load growth would affect the decision to upgrade. However, CCEC has misread the "primary reason" test. "Primary reason" is not identical in meaning to "exclusive reason". A better reading of the "primary reason" test suggests that the BPA requires a utility to show that an upgrade would not have been undertaken "but for" the charge.

This reading is consistent with the BPA's decision granting relief in the case involving a transformer substation located at West Burley, Idaho. In that prior decision, the record indicates that the upgrade would not have been undertaken had it not been for the savings resulting from the avoidance of the charge. There is no dispute that the upgrade was motivated by other reasons as well, but the transformation charge was a "primary reason" for the improvement. Contrary to CCEC's assertions, the guidelines were consistently applied to CCEC and the West Burley substation.

CCEC points to another case involving a substation at Boardman, Oregon as an example of inconsistent decisionmaking. The BPA counters that the Boardman decision was made independently of the program for mitigation relief. The record contains conflicting support for each of these assertions. However, this conflict is insufficient to form a basis for overturning the BPA's denial of CCEC's claim. This court's review is governed by the highly deferential standard of 5 U.S.C. sec. 706(2)(A), and the record does not provide sufficient reason to disturb the BPA's denial of relief.

We need not decide the other issues raised by CCEC. It is undisputed that the primary reason for CCEC's upgrade was to improve the condition and reliability of its transmission system. For this reason

alone, the BPA was justified in denying mitigation relief.

The petitions for review are DENIED.